REGULATIONS May it please the Court, my name is Brian Failing, and I represent Stanford Skolnick and American Airlines, Inc., the petitioners in this case. There are a number of antecedent issues, I suppose, before we get to the substantive issue of whether or not a Federal Aviation Regulation which impacts First Amendment rights is subject to First Amendment scrutiny. The tests will vary depending upon the nature of the form. The first question I think that has to be answered, of course, is whether or not the filing out of time, the statutory 60-day deadline for filing with respect to administrative regulations. And related to that, and it's a prior question, is why isn't this case moved? Well, it's not moved because in our petition, Your Honor, and I believe it's at paragraph 21, that we indicated that we, Mr. Skolnick and his company, wished to fly not only on the October 3rd through 5th of 2003 event at Disneyland, but also thereafter. In other words, once he became aware of the nature of the event that went on annually at Disneyland, he thought he would like to on an annual basis then ---- Where does it say annual? Where is this in the record? Can you tell me that? Sure. Let me find some more of this petition. Actually, I believe it's in our petition, paragraph 62, if I can read it for the Court. Petitioners desire to fly over Disneyland on October 4, 2003, and thereafter toying a banner, et cetera, with respect to ---- And thereafter? Could you read it more slowly? And thereafter what? Toying a banner, encouraging homosexuals to repent. The message was that this is a place to trust in Jesus Christ. Does it say what the banner says? Yes, it does. It specifically identifies a specific event, and it indicates it's a place to trust in Jesus Christ. That's what he says he wants to do thereafter? Well, the petition itself within the body of it indicates that there is hope in Jesus Christ, I believe is what the banner explicitly says, Your Honor. That was the banner he wanted to fly over with on ---- Yes. But he doesn't want to fly over with any other banner, and he doesn't want to fly over except on day days. Well, with respect to the urgent petitioner ---- He doesn't want to engage in his advertising business over Disneyland. No, that's not necessarily true, Your Honor. He wanted the ability to conduct his business. There was one other occasion a number of years prior to this where he had been secured by a Disney subsidiary to do some filming, apparently over Disneyland. I think it was with respect to ---- So his concern is with any banner he wants to fly over Disneyland? Well, his concern is that he ---- And whenever he wants to fly it? Yes. The occasion, though, which prompted his interest in wanting to be able to do this, at least on an annual event, of course, was the idea that Disneyland did hold a gay day handling. Well, the reason this matters, of course, is because if he has a general interest in flying over Disneyland, then it's hard to explain why he couldn't have challenged it within the 60 days. Right. No. What I wouldn't ---- What I would not do is this ---- He doesn't have a general interest. That's what you're now saying. No. He had a ---- The particular interest that motivated this litigation was when he did discover the October 3rd through 5th event. He discovered that in August, immediately contacted counsel. That's Judge Berzon's point. That was two years ago. Right. But it was thereafter. Once he became aware of that event, the petition does identify thereafter. He was looking for one day on this particular occasion, but the thereafter clearly identifies the events that would come thereafter. Well, it doesn't clearly identify the gay days, the annual gay days. You're saying it's he wants to just be able to fly over Disneyland for whatever reason. No, because he hadn't historically flown over Disneyland for whatever reason. What prompted specifically is the desire to do it between or I think he identified October 4th as the specific day he wanted to fly his banner. And thereafter, meaning ---- That's the problem, to be frank about it. All right. There is a statutory deadline. Yes. If you had an event which hadn't been announced yet, I would be inclined to and a credible story about that's what you were interested in and not something else. I would be inclined to think that there was reasonable cause not to comply with the 60 days. But here we have an event that had been announced already. Right. The gay days had already been announced. You just your client just didn't know about it yet. It wasn't announced to him. I mean, it may have been announced to somebody. I mean, it was publicly available. Right. He says he didn't know about it. He did not. And I believe the court ---- He doesn't just say he hadn't formulated his interest yet. He says I didn't know about it. I didn't know about it and therefore I hadn't formulated it. And I would note this is the first time that's been challenged with respect to his veracity because it's ---- No, I'm not challenging his veracity at all. I'm not challenging that. And what I'm saying is simply that there does seem to be some tension here between the mootness issue and the reasonable cause issue because if his interest is in generally pulling a banner, including an advertising banner, over Disneyland, that interest, there's no reason he couldn't have had it, wouldn't have had it within the 60-day period. That's the problem that I'm having. Okay. May I respectfully disagree with the court's characterization? I may have misunderstood what the court was saying. Your Honor, the ---- at a minimum, substantial interest with respect to what ---- when one can challenge the regulations, at a minimum, courts have said, means Article III standing. That means a ---- But in the First Amendment context, that's relaxed all the time. No, Your Honor, again, with all due respect, there must still be some concrete injury that's not speculative. So you couldn't have come in, in ---- within the correct time period and said basically what you're now saying, which is I want, in general, to be able to fly with my banner, whatever banner I choose to have, over Disneyland. Because that interest is not related to the gay days. That's what's bothering me. Well, but what I'm suggesting is that setting in the shadows, for instance, is, I suppose, some general interest, but that would be true for the entire country. What all Mr. Skolnick can do ---- I mean, in other words, his opportunity to fly. All Mr. Skolnick can do ---- But you see, this matters, because if he was willing to have an order that said all I want is an order that says I can fly on gay days with a sign that says, you know, Jesus loves you, that would be one thing. But you're telling me that's not what he wants. Well, actually, he does. I ---- and we requested that specifically that the FAA be not be permitted to enforce the NOTAM that exists over at Disney, with respect to his flying over it on that particular day. I believe that the ---- The particular day is over. All right. So what is it that you want now? Well, we would still then request for the next gay day a way ---- an injunction against the FAA from enforcing its NOTAM. I do think, Your Honor, if the Court gets to the ---- would get to the point, and it says, you know what, this injunction ought to issue, that is the only way that the natural import from that, the unavoidable consequence is that that NOTAM is indeed unconstitutional, whether it appertains simply to the gay day event or more broadly. And I would put it in another First Amendment context. I mean, we do a lot of cases where ---- Well, it may well be unconstitutional with respect to noncommercial speech, but noncommercial speech. I mean, I'm not saying it's unconstitutional with respect to anything. But the interest is different, the analysis is different. Sure. Well, it is different. But I would also note that oftentimes an individual, for instance, a city will have an ordinance on books for decades sometimes, and there will be an individual who has lived in that town for the longest time, and if suddenly it occurs to him, I want to go exercise my First Amendment rights in the park, let's say that they had a permit scheme which was a prior restraint, and we see this all the time, and it limited the number of people that could congregate to one. And he sees this, he contacts the lawyer and says, is this right? Well, this would be the first, and he wants to have an event. There's an event going on in a particular day. But that statute doesn't have the time period. Now, I would be very troubled by a time period that did not have an out for a later developing First Amendment interest. But what's troubling me here is that the interest that you're now standing on, because otherwise the case could be moved, is one that you did have earlier that couldn't have been a late-developing one. That's what's bothering me. No, Your Honor, I don't – if I communicated I'm standing on it, I'd certainly know I briefed it and it was unintentional on my part. What we are standing on is the right specifically that gave us standing in the first instance, which was that Mr. Skolnick did learn of gay days, did then want to fly his banner, and do so thereafter on that particular date. The inevitable consequence of that is that the date continues. Well, I think that we indicate yes in our petition that it's in an annual event. I think with under notice pleading rules, that's more than adequate, I would think, when we state annually that it occurs that it is an annual event. And certainly the petition was designed and intended within the context of the Federal rules to express the idea that Mr. Skolnick would indeed like to fly over Disney, not only on the 4th of October in 2003, but thereafter. The rule you're arguing for, the reasonable grounds, the problem I have with it is that basically, this is a statutory provision that says you've got 60 days. And what, if we were to agree with you, then anybody who suddenly decided to challenge something specific would be able to get around the 60-day rule. And that's, that would just do away with that statutory provision. And clearly, that would be against what Congress intended. Your Honor, I don't think it would do away with it. Oftentimes, first of all, most of these regulations deal with specific instances, specific people. Or groups of people at discrete times and places. In this particular case, I think the rule does recognize by definition that there will be occasions under where there will be people who wouldn't have an interest initially, but do so, or would likely have an interest later. So the 60-day rule you're arguing for, the reasonable grounds, the problem I have with it is that basically, this is a statutory provision that says you've got 60 days. And what, if we were to agree with you, then anybody who suddenly decided to challenge something specific would be able to get around the 60-day rule. Your Honor, I don't think it would do away with it. And I think the court, 5 U.S.C. Section 706-2B, indicates that with respect to constitutional questions, for instance, I'm moving a little laterally here, or perhaps vertically, I guess. But it indicates that the Court has an independent duty apart from the APA standards of arbitrary and capricious, for instance. And then you read that together with the Article III standing, and the question of a constitutional issue that is being raised here, this is not a specific ruling against Mr. Skolnick that says you cannot fly for such and such reasons. This is a general prohibition to the world. And we would not have had Article III standing in March when this was passed. And I would submit to the Court that it would have. Because he's a businessman whose business is flying advertising, you know, flyers, banners. And if he has – and I gather he wants to fly those advertising banners over Disneyland. He certainly knew Disneyland was there in March. You are – but he's only flown there once, and that had been a number of years ago. That would be imposing upon him a burden of omniscience. And I would submit that this Court would have kicked us – not this Court, a lower court, a district court would have kicked us out on standing grounds, because his – his one desire would have been speculative. And the Court would have said, well, what can you concretely tell me you want to do? Do you have any business? No. Do you intend to fly there? No. That is called speculative and utterly hypothetical. Now he's saying he does want to fly there. Pardon? Now he's saying he does. Well, that – but when he did was when he learned in August of 2003 about gay days. That's when the concrete, palpable, non-hypothetical, non-speculative injury kicks in. See, that puts – that rule of law would put it in the hands of every single individual when they decided something, anything, whatever it was, that they could go and file a petition like this, despite the 60-day rule. It's just you're just arguing for something that's way too broad. Your Honor, I don't think so, because I think the statute itself provides for that. When – when it says a substantial interest and the courts have said that means Article III standing. Because with all due respect to the Court, Mr. Skolnick would not have had standing. He did not have a substantial interest in it. But we have two judges on the Court of Appeals telling you we disagree. I understand, Your Honor. And I – I mean, so – Okay. But I would ask the Court – No, I mean, I considered this issue at that point. I – Your Honor, I'm hoping to persuade you otherwise, but I understand what the Court's saying. I do want to interpret this rule in a way that is sensitive to the First Amendment. And I do think there has to be a fair amount of room for people to both self-determine what they want to speak about. I'm just questioning its application at that principle here, given that what we know about Mr. Skolnick's business, i.e., he's not – this is his business, and, B, what we know about his currently asserted interest, which is to use that business over Disneyland. Well, only in the sense, Your Honor, that if the no-tams are eliminated. But with respect to the specific claim and the specific legal basis for requesting – Supposing our conclusion was that no-tam – this no-tam is no good as it applies to religious speech, but it's okay as it applies to commercial speech. Would that make him happy? No, it wouldn't as a practical matter. Well, but it would grant us our relief, and that's part of Article III's standing. Could the Court give us – can we get the relief for requesting even under such a narrow reading, Your Honor? And, yes, we could get that relief. So now we do satisfy Article III's standing. And I would like to emphasize again for the Court, knowing that I've got at least two who disagree with me on this. No, no. I said on the standing point. Okay. Yes, on the standing. Now I'm coming back to it, Your Honor. We would not have had Article III standing. I believe that Congress, in passing these regulations and these statutes, wants to protect constitutional rights. The flip side of what the Court is saying is that somebody can be – a whole body of people, for instance, banner floors, can be forever foreclosed from challenging a non-constitutional regulation if a 60-day window passes and they didn't have a substantial interest. It's just too bad. I don't think that – I'm still in effect. Yes, it is, Your Honor. In fact, the government has submitted a letter to the Court indicating that the legislation that is perpetuating this is once again being renewed by the Congress or has been recently. I'd entertain more questions, Your Honor. I'd like to reserve a little time, but the standing thing is important. I know if I don't get past that, I'm dead. We'll hear from the government. Thank you, Your Honor. Is this the government? May it please the Court. I'm not sure that I'm going to be able to do any more with the timeliness issue than the Court has already done. You've fleshed out the problems with the timeliness in this area. I think the one thing I would like to address, though – But you seem to take a much more definite position. I mean, my understanding of your – I mean, is it your position that if some event didn't happen until after the 60-day period and somebody came in with a First Amendment claim and said, I want to fly with a banner about that event, the event hadn't even happened until the 60-day period, would that be a reasonable cause? No, Your Honor, that's not our position. Our position is very case-specific. It's that when you come in after the 60-day period, it's the burden of the Petitioner to show under the statute reasonable cause and that they have not shown reasonable cause here. But would that kind of speech interest be a reasonable cause? Well, I guess – In other words, is your problem that the speech interest itself is just not a reasonable cause, or what? Well, it's in part that the speech interest here, this is really not a First Amendment case in our view, as you know. That's what I'm trying to find out. On the – on the timeliness question, is your position that no matter – even if they were very specific about what it is they wanted to speak about and the thing hadn't even happened yet, so there's no doubt that they couldn't have formulated their interest, that the 60-day period would still run? No, I don't think that – I do not think – I'm speculating about what our position would be. I do not think that would be our position if the event hadn't even been in place. This is an annual event. They could have found out about it. They could have brought us the events in place, but he hadn't – didn't know about it yet. That's right. Well, I mean, I think, again, you're sort of creeping towards this case. We're not quite there yet. But once again, what I would point out is that what you've heard as far as articulating why this case is not moot is a more general interest, and that more general interest, as Your Honor was explaining earlier, was sufficient to confer standing sort of at the outset to challenge this so that there is a proper timeline. Suppose we were to say, all right, so that can't be the case, but insofar as he has an interest in continuing to fly over the annual event of gay days with this particular sign, is that issue moot? Is that issue moot? I guess it's not moot. Maybe it's not. Once again, I don't want to push a hyper-technical timeliness issue. It's our duty to raise the jurisdictional point. We think that on the merits, the First Amendment claim, this is not a First Amendment case, but this is the case. Well, I have a very hard time with that. I mean, isn't this an O'Brien case? No, Your Honor. It may be a winning O'Brien case for you, but isn't that how we have to analyze it, that basically this is a speech-neutral statute with an impact on speech? Isn't that what we have to look at it as? No, Your Honor. I believe this is an arcara case. An arcara case? An arcara case. Basically, it's like the non – it has nothing to do with speech. O'Brien didn't either. It was about burning draft cards. Well, but arcara – let me put it in arcara terminology, because there the issue was a public health regulation that had an impact on the bookseller and the First Amendment rights of the bookseller. And the Supreme Court was very clear that when you have a facially neutral statute that doesn't talk about speech or distinguish speech effects in any way, that you don't analyze sort of a security measure on the ground. But we have, you know, a million cases probably where we don't do – then what's left of O'Brien after that? Well, in a lot of the cases that are analyzed under O'Brien, you have in some sense – it really is focused in some way on the speech. What about the Clark case about sleeping in the park? There was a rule against sleeping in the park. It didn't say anything about speech. The interest wasn't a speech interest. Wait. And it was analyzed as an O'Brien case. Well, I was – I'm going to go back to O'Brien itself there. The issue was the burning of the draft cards. It was very much a speech communicative thing. That wasn't what the statute was about. The statute said you have to keep your draft card. It wasn't about speech. So I just don't see the difference. Well, once again, Your Honor, I mean, maybe there is some tension between the arcara line of cases and the O'Brien line of cases, but we really do – What about the sleeping in the park case? Isn't that just like this? As it's – that doesn't answer anything, but it just says what line of analysis we use. Well, I don't want to push – I don't want to argue too much on that point, because I do believe, as Your Honor said at the outset, we win under the O'Brien test. This is a – But you didn't brief that, which makes it very difficult, because you were so insistent that this is a First Amendment case. Well, there were a lot of – it's one of the things where it was almost – there are too many ways in which we could win the case, and it's difficult to, you know, follow through with all of them. We do really believe this fits under the arcara mold, and that really the way that you get your head around this sort of flight restriction is by thinking about what similar sorts of perimeter restrictions on the ground would look like and how, you know, it's like a – it's like a security perimeter around a Federal building. What about the Bay Area Peace Navy case? Isn't that the same thing? Well, again, Bay Area Peace Navy is very specific, targeted at the protester's speech, and there was no – It was targeted on the fact that no boats can be a certain distance from – from this bunch of boats. Your Honor, I said – I totally said they didn't say anything about speech or not speech. The security cordon was imposed precisely because they had had problems with the protesters at the fleet parade before. But that wasn't the rule. The rule was a non-speech rule, no boats. I understand, Your Honor, but the court – This is a non-speech rule, too, no airplanes. Well, no, but this is – it's not – it's not no airplanes. That's – you know, that's – it's not banner towers in any way. It's no flights that are permitted in and out of the zone. You said no airplanes. I understand that. But the court in Bay Area Peace Navy was looking very much at the history, the record that was developed in that case, and why that particular thing. Suppose we thought this was an O'Brien case. Can you quickly give us an O'Brien analysis of it? Sure. It's a – it's a reasonable time, place or manner restriction justified by a compelling government interest in preventing or at least reducing the risk of aerial terrorist activities. And 3,000 feet and 3 miles is a reasonable, you know, bubble, if you will, to put over major open-air assemblies. And the – it's not just the agency's judgment here. This is something that the Congress has gotten into the act and said in one statute, we want you to keep it in place for one year, and then more recently said, you have to keep this in place indefinitely, and you cannot grant waivers from. This is not some wayward agency saying, we think this might be a good idea to impose these bubbles over major open-air assemblies. I thought this – so there – it applies – what does the statute apply to now? It prevents – It applies to major sporting events and what – to what – The statute – the most recent statute, the February 2004 statute, names the Disneyland No-Tam by name, by the actual number, and says you must keep this in place and you must keep the other ones that apply to major open-air assemblies covering sporting events. Those are more tailored because the sporting event only has a lot of people in it at a particular time. But the Congress has said you must keep those in place and you cannot grant waivers from those restrictions in the most recent statute. And that is a – it's a facially reasonable thing to do. Could it have been, you know, plaintiffs' Petitioners say, well, maybe you should have done more because this really doesn't give you meaningful safety benefit. But once you get into sort of judging how much, how far, that really is something quintessentially for the political branches, like the FAA, with expertise in this area, to judge. And it's difficult for the Court, and the Court is ill-equipped to sort of come in and second-guess, well, 3,000 feet really maybe doesn't give you enough protection. And so really, the conclusion under O'Brien is that it is – there is clearly a security interest here that is being served in some way that the courts need to defer to. Ginsburg. There's a – there's a probably – you probably meet the interest standard. And the next question is whether there are alternative, ample alternatives for reaching the audience. What alternative would there be for reaching the audience? Well, that's correct, Your Honor. And in our brief, we identified at least a few. There's obviously ground-based alternatives. You could come into the park and attempt to, you know, distribute pamphlets to convey your message. Those were things that were not present in Bay Area Peace Navy, where the target audience was secluded on a pier. You couldn't get to the military officials in Bay Area Peace Navy. And that formed a big part of the – That depends on Disney being willing to let you do that. Well, and again, we also pointed to other aerial opportunities. There is a company called Big Up that basically allows you to fly – and we cite this in our brief – fly the very large banner tow options above 3,000 – that are visible above 3,000 feet. Petitioners say they can't do it, but the notion that it is some way communication is all the way foreclosed here is simply wrong, even under the O'Brien analysis, which, once again, I want to emphasize, we don't believe this is a First Amendment case. We believe it's a Narcara case. But I'm trying to go with the analysis. I absolutely do not.  So, all right. Well, I mean, I would go back to Arcara. I mean, that case – and this Court has also applied that sort of analysis in, for instance, the Talk of the Town case that we're dealing with – we cited in our brief. Did that involve the revocation of a liquor license for an exotic dancing establishment? And they said, well, this impacts our First Amendment rights. It's a First Amendment case. And the response from the Court, from this Court – I believe it was a 2002 case – was, no, this does not implicate the First Amendment. This is a – this is a – You can dance as long as they have a liquor license. They're not stopping you from dancing, but here they are stopping them from dancing. No, no, no. They were stopping the dancing in Talk of the Town. So maybe I misspoke there. If you had a liquor license. They – the liquor license was the law that didn't impact speech in any way. The establishment was not complying with that. The establishment was closed down. They were foreclosed from doing their exotic dancing. Their First Amendment rights were impacted in that way. And this Court said this falls within the Arcara line. This is, you know, an ordinance that's just being enforced. And yes, it has some impact on the First Amendment, but it's – you know, it doesn't fall into the First Amendment analysis any more than stopping, as Justice O'Connor said in Arcara, stopping a newscaster for speeding would have any impact on First Amendment. You can't just transfer everything into First Amendment analysis and get all the heightened standards when you're dealing with these – these sorts of standards that don't talk about speech. But as I was trying to go through before, I think we also win on the O'Brien analysis, and there is, of course, the time in this question at the threshold that the Court was dealing with. I don't want to overstay my welcome. I'm mindful of the Court's comments. If there's any questions. Kagan. Thank you very much, counsel. I have a question. Okay. Thank you. Mindful of my time, I'll move right along. A couple of quick things. This – this case is not about – is not Arcara. This is not about a private building in some tangential fire code. This is a forum case issue, and this Court will be, I assume, getting before it soon, a case out of Hawaii where you had a lower – a lower court judge finding, Federal Court judge finding that the public airspace above Honolulu is a nonpublic forum. I think that's decidedly wrong in light of Cosby with all due respect to the lower court.  Do you think that – do you think that – ask one. Do you think that airspace constitutes a traditional public forum? A what? A traditional public forum as the Supreme Court case is? No. I think this is where you have the intersection of the First Amendment with the onset of modernity with respect to technology. In other words, the First Amendment contains a principle of speech and the ability for people to exercise free speech in public fora. The sky above us clearly has been used, for instance, much more for communicative purposes than, say, for instance, the water in Bay Area Peace Navy, which it was conceded there by the government was public fora. And so the air, while the barriers to entry may be somewhat more limiting in terms of the numbers of people that can get up into the sky, it clearly has much more of a history with respect to communicative activity than does the water that this court in Bay Area Peace Navy accepted as a public forum. And so the mere fact that it hasn't been time out of mind utilized as public fora I do not think precludes it from operating as public fora. Indeed, the government, the FAA, has permitted sky writing, has permitted banner towing. So it's recognized that communicative activity does occur there.  I'm not prepared to say it's traditional because it certainly doesn't fit into the time out of mind description. However, it does fit into the category that says communicative activity does occur there. We know out of sight we have broadcast bands from radio and television that pass through the airwaves in the sky, and that's utilizing them for purposes of communication. So there is a First Amendment tilt towards the skies overhead and our ability to use them. And in this particular case... Do you have to, does one, if anyone, if one wants to avail themselves of this particular public forum, do they have to first always get government permission? What they have to do is fly within the boundaries of FAA regulations with respect to 500 foot minimum ceilings. I think that may be one over certain areas where if you fly below that, you can, for instance, an airport, if they allow aircraft to come in at too low of a level, I guess there could be a taking that would occur. And that's kind of what the Cosby case dealt with, was an unlawful taking because the argument was they were flying. I think it was actually above the FAA-imposed level, but the Court came back and said, look, the government can regulate to that minimum threshold, and as long as people stay above that minimum threshold... And I think that's a good point, and I think that's a good point, too, is that essentially what Mr. Skolnick recognizes, that he would probably have to get a security clearance, right? No. Mr. Skolnick had passed all the security clearances. In fact, he had even... But in terms of the question that Judge Wardlaw asked, i.e., that there are essentially government permission requirements here before you can fly. There are. And with respect to the security clearance, it's our position that those requirements were reasonably related to the national security purpose in the sense of waivers generally. If we were to deal with the O'Brien issue here, what difference would it make if we looked at it as an O'Brien case, if we looked at it as a time, place or matter case? Would that make any difference? Well, I'm not sure that it would, Your Honor. I think our argument is broader than that. But I don't know that it would because the government... What do you mean your argument is broader than that? Well, we do have Fourteenth Amendment. And the Fourteenth Amendment does intersect with the First Amendment in terms of the idea that, for instance, Disney, the operational purposes exception in where one can get a waiver to fly over Disney Airspace clearly includes bannertoing, because in our petition, and it seems as though the government has conceded in their briefing that... Do you have an equal protection argument? Is that what you're saying? Pardon? You're saying there's an equal protection problem? There also is an equal protection argument, yes, Your Honor. We have a brief case. But that doesn't answer my question. I want to know, in the First Amendment analysis, does it make any difference if we looked at it as an O'Brien case? I'm not sure that it does, because I think under either analysis, the government under Bay Area Peace Navy and other cases have said the government is required to come forward and show you can't just have this talismanic incantation of national security or the President's well-being. You have to affirmatively come forward and show us that you are not suppressing any more speech than is necessary. And our argument is that they have. Under either O'Brien... That phrase has the same meaning, whether it's a time, place, and manner or not. Yes. So the public forum issue just doesn't matter. Well, I don't agree with that. It's just because the question is what is the proper way. Well, in terms of outcome, Your Honor, I don't mean to... Accounts or anything else. Okay. If we're going to apply the same standard, whether we look at it as a restriction on non-speech with an incidental interest on speech or as a public forum, then what's the difference? Your Honor, I don't – I haven't thought that through. I'm not sure that I can identify one for the Court. All right. Thank you, counsel. Skolnick v. FAA is submitted, and this session of the Court is adjourned. All rise. This Court is adjourned 10 to 10.
judges: Wardlaw,berzon, Fitzgerald